IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| GOOD SPORTSMAN MARKETING, LLC, And IP HOLDINGS, INC., | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 6:07-CV-395 |
| vs. | § § | Jury Trial Demanded |
| LI & FUNG, LIMITED, LI & FUNG (BVI) LIMITED, and TOY ISLAND (USA), INC. | § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT
## LI & FUNG, LIMITED'S MOTION TO DISMISS

Plaintiffs Good Sportsman Marketing, LLC ("GSM"), and IP Holdings, Inc. ("IP Holdings") (collectively, "Plaintiffs") submit this opposition to the Motion to Dismiss filed by Defendant Li & Fung, Limited ("Li & Fung").

## I.    INTRODUCTION

Defendant Li & Fung is subject to the personal jurisdiction of this Court in this design patent infringement case under the stream of commerce theory. The evidence establishes that Li & Fung controls a global product sourcing, distribution and sales network which has been responsible for manufacturing and importing into the United States the accused infringing products, and then distributing those products throughout the United States, including Texas, by selling the products to national retailers.

In particular, Li & Fung is the export trading arm of a collection of over 100 multinational companies doing business as the "Li & Fung Group." Li & Fung emphasizes its "extensive global presence" with over 14,000 employees and 80 offices

around the world "covering over 40 economies" including the United States. Li & Fung sources the manufacturing of the accused products through its wholly owned subsidiary Toy Island Manufacturing Company, Limited, and then markets the accused products throughout the United States through another wholly owned subsidiary based in New Jersey – Toy Island USA, LLC. Toy Island USA sells the accused products to established nationwide retailers, such as Barnes & Noble, Best Buy and Toys `R Us. The accused products are available for purchase in Texas through the web sites of one or more of these retailers. Li & Fung oversees this global manufacturing, distribution and sales process.

Thus, Li & Fung controls a global distribution network that purposefully introduces the accused products into the stream of commerce directed at the entire United States market, including Texas. Toy Island USA is essentially Li & Fun's marketing division in the United States. Consequently, Li & Fung knew or reasonably could foresee that the accused products would be offered for sale and sold in Texas and is, therefore, subject to the personal jurisdiction of this Court.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

A.    **The Design Patent Infringement Litigation**. In this lawsuit, Plaintiffs have sued Li & Fung and Toy Island USA, LLC (formerly Toy Island USA, Inc.), for infringement of U.S. Design Patent No. D498,322, owned by IP Holdings and exclusively licensed to GSM. Plaintiffs allege that Defendants have infringed the `322 patent through the unauthorized manufacture, sale, and distribution of book clip lights which copy and simulate Plaintiffs' protected design. Complaint ¶¶1, 7-8, 13-16, 19-26. Plaintiffs specifically allege that Defendant Toy Island (USA) is a Delaware corporation

2

with its principal place of business located in New York City, and that it is a wholly owned subsidiary of Defendant Li & Fung, "which is the active moving force behind its [wrongful] actions."  Complaint ¶¶11, 26.  With respect to personal jurisdiction over Li & Fung, Plaintiffs allege that "[t]his Court has personal jurisdiction over Defendants because they have purposefully shipped and sold their infringing products through established distribution and retail channels into the Eastern District of Texas . . . ."  Complaint ¶3.

      **B.**     **Defendant Li & Fung's Global Business Operations.**  Li & Fung is a company organized under the laws of Bermuda with its principal offices located in Hong Kong.  Li & Fung Motion to Dismiss (Dkt #21) at 1-2.  Li & Fung describes itself as "the export trading arm of the Li & Fung Group, managing supply chains for major brands and retailers worldwide."  Buether Declaration at ¶2 – Exhibit A.  The "Li & Fung Group" describes itself as "a multinational group of companies driving strong growth in three distinct core businesses," including "export sourcing through Li & Fung." Buether Declaration at ¶3 – Exhibit B.

      Li & Fung files an annual report on behalf of itself and all of its direct and indirect subsidiaries, in which Li & Fung refers to its companies collectively as "the Group."  *See* Fisch Reply Declaration (Dkt #45-2) at ¶11.  According to Li & Fung, the annual report contains a basic description of the operations and finances of "the Group," and summarizes "the general activities, products and services of Li & Fung's companies world wide." *Id*. at ¶12.

The Li & Fung Annual Report for 2007 contains a map of the world with the headline "Global Reach, Local Presence." Buether Declaration at ¶ 4 – Exhibit C at 4.[1] The 2007 Report emphasizes the Company's extensive global sourcing network covers over 80 offices in more than 40 economies around the world."  The map shows that three of these offices are located in the United States – Boston, New York and San Francisco. *Id*. at 5.  The report asserts that, "[w]ith a growing network of nearly 10,000 international suppliers, Li & Fung explores the world to find quality-conscious, cost-effective manufacturers in order to provide the highest-quality goods, exceptional value and reliable, on-time delivery."  *Id*.  Li & Fung also points out that "our 13,300 staff around the world gives Li & Fung . . . global reach and local presence . . . ."  *Id*.  Significantly, the report declares that "the US market remains important to the Group," and that "[g]rowth has also been derived from the US onshore business. . . ."  *Id*. at 7.  The report states that "[t]he Group believes believes that an important stream of growth could derive from replicating its US onshore business model in other large consumer markets such as Europe and China."  *Id*. at 8.  Finally, the report concludes that "[t]he Group's increased diversification, extensive global presence and reach, and spread of business lines has confirmed Li & Fung's strength worldwide and provide reason for cautious optimism despite global uncertainty."  *Id*.

**C.    Li & Fung's Control of the Manufacturing, Importation and United States Distribution of the Accused Products.**  Li & Fung owns numerous companies that conduct business operations in the fields of export sourcing, distribution and retail. Li & Fung Motion to Dismiss (Dkt # 21) at 6.  Two of these companies are Toy Island

---

[1]  The 2007 Annual Report is of particular importance, because this lawsuit was filed in August 2007.

USA and Toy Island Manufacturing Company, Limited ("Toy Island Manufacturing").
Buether Declaration at ¶4 – Exhibit C at 11. Li & Fung admits that these wholly owned
subsidiaries are responsible for the manufacture, sale and distribution of the accused
products in the United States. Li & Fung Motion to Dismiss Reply Brief (Dkt #45) at 1;
Li & Fung BVI Motion to Dismiss (Dkt #44) at 6.

Toy Island USA has been a wholly owned subsidiary under the Li & Fung Group
since its founding in 1989. Buether Declaration at ¶5 – Exhibit D. Li & Fung describes
Toy Island USA as a "marketing" company. Buether Declaration at ¶4 – Exhibit C at 9.
Toy Island USA presently has its headquarters located in New Jersey, and prior to 2009
was headquartered in New York City. Toy Island Answer at ¶11; Weinberg Deposition
at 8. Toy Island USA is a sales and marketing company which sells the accused products
in the United States. Weinberg Deposition at 6, 66. Toy Island USA sells the accused
products to established nationwide retailers, such as Barnes & Noble, Best Buy and Toys
`R Us. Weinberg Deposition at 32-38, 65-66.

Toy Island USA sources the accused products exclusively through Toy Island
Manufacturing – another wholly-owned subsidiary of Li & Fung. Weinberg Deposition
at 9-10, 52. Toy Island Manufacturing completely handles the selection of the
manufacturers who make the accused products. Weinberg Deposition at 9-10, 25. Toy
Island also provides numerous other services in connection with the fulfillment of orders
for accused products procured by Toy Island USA. Weinberg Deposition at 45-46, 52-
55, 59-60. Once an order is received from a customer in the United States, Toy Island
Manufacturing arranges for the product to be manufactured, ships the product directly to
the customer in the United States, collects payment from the customer, pays the

manufacturer for the manufacturing cost, pays any royalty payments due to licensors, pays itself a commission for performing these services, and then remits the net amount to the Toy Island USA account. Weinberg Deposition at 50-55, 59-60. Toy Island USA's CEO frequently met with the head of Toy Island Manufacturing to discuss their business operations. Weinberg Deposition at 24-27.

As wholly owned subsidiaries of Li & Fung, Toy Island USA and Toy Island Manufacturing conduct these operations under the supervision and control of Li & Fung. Robert Weinberg, the CEO of Toy Island USA, was hired by Li & Fung after interviewing with Henry Chan, an Executive Director of Li & Fung. Weinberg Deposition at 13-15; Buether Declaration at ¶4 – Exhibit C at 2, 9. Weinberg regularly attends "Senior Managers Meetings" conducted by Li & Fung, along with numerous other senior executives working for the Li & Fung Group, to discuss past performance of and future plans for the Toy Island USA business. Weinberg Deposition at 18-19, 23. Weinberg also regularly had product review meetings with Li & Fung executives to discuss products that Toy Island USA was trying to sell to customers in the United States. Weinberg Deposition at 20-21. Weinberg also had occasional discussions with Li & Fung executives to discuss updates regarding the business of Toy Island USA. Weinberg Deposition at 22. There is no board of directors for Toy Island USA. Weinberg Deposition at 52.

Li & Fung provides other support for the operations of Toy Island USA. LF USA, another Li & Fung subsidiary, provides human resources and information technology services to Toy Island USA. Weinberg Deposition at 47-49, and Weinberg

Deposition Exhibits 3 and 4.  The e-mail address for the CEO of Toy Island uses the LFUSA domain name.  Weinberg Deposition at 70-71.

        **D.**      **Li & Fung's Motion to Dismiss.**  Li & Fung has filed a motion to dismiss the claims against it contending that the Court does not have personal jurisdiction over it. Li & Fung asserts that it does not manufacture, distribute, market, sell or advertise any products, let alone the accused product, anywhere in the world, nor does Li & Fung receive any revenues in connection with the manufacture, distribution and sale of the accused product.  Li & Fung Motion to Dismiss (Dkt #21) at 6.

### III.    ARGUMENT

### A.    THE APPLICABLE LEGAL STANDARD

### 1.    The Due Process Standard

        Rule 12(b)(2) allows a court to dismiss a case where the court does not have personal jurisdiction over the defendant. FED. R. CIV. P. 12(b)(2).  The law of the Federal Circuit governs the question of personal jurisdiction in patent infringement cases. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564-65 (Fed. Cir. 1994). "Determining whether specific personal jurisdiction over a nonresident defendant is proper entails two inquiries: whether a forum state's long-arm statute permits service of process, and whether the assertion of jurisdiction would be inconsistent with due process." *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003).  The Texas long-arm statute is coextensive with due process requirements.  *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000).  Thus, the Court's inquiry is limited to whether the assertion of jurisdiction would be consistent with due process.

        To comport with due process requirements, a nonresident defendant must have

certain "minimum contacts" with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).   Minimum contacts may be established on two levels.    First, "general" personal jurisdiction exists where "the defendant [has] 'continuous and systematic' contacts with the forum state and confers personal jurisdiction even when the cause of action has no relationship with those contacts." *Silent Drive, Inc.*, 326 F.3d at 1200 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414-16 (1984)).   Second, "specific" personal jurisdiction is "based on activities that 'arise out of' or 'relate to' the cause of action and can exist even if the defendant's contacts are 'isolated and sporadic.'" *Silent Drive, Inc.*, 326 F.3d at 1200 (citing *Burger King Corp.*, 471 U.S. at 472-73) (alteration marks omitted).   Plaintiffs contend that Li & Fung is subject to the specific jurisdiction of this Court.

The Federal Circuit has outlined a three-prong test for determining if specific personal jurisdiction exists.    Courts are directed to look at 1) whether the defendant purposefully directed its activities at the residents of the forum; 2) whether the claim alleged by the plaintiff arises out of or is related to those activities by the defendant; and 3) whether the assertion of personal jurisdiction is reasonable and fair. *Hollyanne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1307–1308 (Fed. Cir. 1999) (citing *Akro*, 45 F.3d at 1545–46).

### 2.    The Burdens of Proof

Once a movant challenges a court's jurisdiction over him, the party asserting jurisdiction bears the burden to show the movant has minimum contacts with the forum state to support jurisdiction over the movant. *Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1334 (Fed. Cir. 2001).   If the party asserting jurisdiction makes such a showing, the

movant bears the burden to prove the exercise of jurisdiction would be constitutionally unreasonable. *Akro Corp. v. Luker*, 45 F.3d 1541, 1546 (Fed. Cir. 1995).

When a court does not hold an evidentiary hearing, the party asserting jurisdiction must make out a prima facie case supporting jurisdiction. *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). The Court will construe the pleadings and affidavits in the light most favorable to the plaintiff. *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003). The court also will "resolve in [the party seeking jurisdiction's] favor, all conflicts between the facts contained in the parties' affidavits and other documentation." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

### 3.      The Stream of Commerce Theory of Personal Jurisdiction

The stream of commerce theory has gained wide acceptance as a basis for personal jurisdiction since the Supreme Court's decision in *World-Wide Volkswagen Corp. v. Woodson*. 444 U.S. 286 (1980). There, the Supreme Court held that the exercise of jurisdiction over a defendant is permissible when the sale of its product "is not simply an isolated occurrence, but arises from the efforts of the [defendant] to serve, directly or indirectly, the market for its product." *Id.* at 297. "The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 297-298.

In *Asahi Metal Industry Co. v. Superior Court*, the Supreme Court reiterated that the stream of commerce theory provides a valid basis for finding minimum contacts. *See*

480 U.S. 102, 112 (1987). However, the Court split as to the exact requirements of applying the theory. *See id.* at 112, 117. Four Justices on the Court adopted the view that a defendant must both place a product in the stream of commerce and take some action to purposefully direct that product toward the forum state. *See id.* at 112. The other four Justices adopted the view that a showing of additional action aside from placing the product in the stream of commerce was not necessary. *See id.* at 117.

The Federal Circuit applied the stream of commerce theory in *Beverly Hills Fan Co. v. Royal Sovereign Corp. See* 21 F.3d 1558, 1566 (Fed.Cir.1994). In that case, a patent holder attempted to bring suit in the Eastern District of Virginia against a Chinese manufacturer and a New Jersey importer and distributor of an allegedly infringing device. Neither defendant had directly sold the allegedly infringing device within the state of Virginia. However, the plaintiff alleged that the defendants had indirectly sold the device there through intermediaries, namely a retailer with stores located within the state.

The court in *Beverly Hills Fan* started its analysis by noting that it was not necessary to decide which of the two stream of commerce theories to adopt "since we find that, under either version of the stream of commerce theory, plaintiff made the required jurisdictional showing." *Beverly Hills Fan Co.*, 21 F.3d at 1566. The court then explained that "plaintiff has stated all of the necessary ingredients for an exercise of jurisdiction consonant with due process: defendants, acting in consort, placed the accused fan in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Beverly Hills Fan Co.*, 21 F.3d at 1566. Ultimately, it did not matter to the analysis that the defendants had not directly sold the

allegedly infringing product in the forum state. It was enough that "defendants purposefully shipped the accused fan into Virginia through an established distribution channel." *Beverly Hills Fan Co.*, 21 F.3d at 1565.  According to the court, "[f[rom [their] ongoing relationships, it can be presumed that the distribution channel formed by defendants and [the retailer] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was Virginia." *Beverly Hills Fan Co.*, 21 F.3d at 1564.

This Court has had occasion to apply the stream of commerce theory of personal jurisdiction on several occasions.   In *GSK Techs., Inc. v. Schneider Elec., S.A.*, GSK sued Schneider Electric and two other companies within Schneider Electric's corporate family for patent infringement. No. 6:06cv361, 2007 WL 788343, *1 (E.D. Tex. Mar. 14, 2007) (Davis, J.). Two of the defendants filed motions to dismiss, arguing that they lacked the requisite minimum contacts with the forum state. *Id.* The Court noted that although the two defendants denied that they introduced the accused products into any distribution network or any stream of commerce anywhere in the world, both were subject to the Court's jurisdiction. *Id.* at *2. The plaintiff provided evidence that the defendants promoted the brand name of the accused products and referred to this brand name on their websites as *their* brand name for the sale of the accused products in the United States. *Id.* at *3. Because the defendants failed to controvert the plaintiff's allegations that distribution channels had been intentionally set up to flow from the corporate family to home improvement retailers across the United State and because defendants further failed to controvert the allegations that the accused products were found in such home improvement retailers in the District, the Court held that "it is only

reasonable to assume that [the defendants] knew, or reasonably could have foreseen, that the [accused product] would be sold in the State of Texas." *Id.* at *2.

Similarly, in *Jacobs Chuck Mfg. Co. v. Shandong Weida Mach. Co., Ltd.*, No. 2:05cv185, 2005 WL 3299718, *4 (E.D. Tex. Dec. 5, 2005) (Ward, J.), the Court held that, despite the fact that the allegedly infringing products were in the forum state as a result of a unilateral decision by companies wholly unrelated to the defendant, the defendant was subject to personal jurisdiction. No. 2:05cv185, 2005 WL 3299718, *4 (E.D. Tex. Dec. 5, 2005) (Ward, J.). In so holding, the Court noted that "[b]ased upon the evidence presented to this Court, it is reasonably inferable that [defendant] knew and expected its [accused products] would be used as components in [the end user products] manufactured and distributed by [the exclusive licensee] to The Home Depot stores in the United States, including Texas." *Id.* at *4. The Court relied on the fact that defendant had granted a third-party distributor the exclusive right to sell the accused products within the United States and that the accused products were found in a nationwide retailer in Texas, specifically Home Depot. *Id.* at *4–*5.

Finally, in *Fractus, S.A. v. Samsung Electronics, Co.*, No. 6:09-cv-203 (E. D. Tex. December 9, 2009) (M.J. Love), the plaintiff accused the defendant of infringing the patents-in-suit by making, using, selling, or offering for sale mobile phones, including, but not limited to, mobile phones with internal antennas. The defendant manufactured mobile phones in places outside the United States. Defendant sold the mobile phones to Sanyo North America Corporation, which then imported them into the United States. Sanyo North America Corporation subsequently sold the phones to Sprint, who distributed the phones throughout the United States. The defendant, a Japanese corporation

headquartered in Osaka, Japan, contested personal jurisdiction on the ground that it did not engage in direct sales activities with Texas citizens and had no other contacts with the State of Texas. This Court denied the defendant's motion, finding that the defendant had sold phones to Sanyo North America, who the imported those phones into the United States, and then sold the phones to Sprint for distribution throughout the United States, including Texas. The Court pointed out that, although the defendant argued it was unaware of where the phones would be sold once imported into the United States, the defendant's introduction of the phones into a distribution network that would likely make the phones available in Texas constituted purposeful direction of the accused products to Texas. *See also ATEN Int'l Co. v. Emine Tech. Co.*, No. 2:08-cv-253, 2009 WL 1809978, at *3 (E.D. Tex. June 25, 2009)

### 4.  Li & Fung Created and Operates a Global Product Distribution Network Purposefully Directing the Accused Products into the United States and Texas

This case presents facts analogous to the facts in *Beverly Hills Fan* and the cases decided by this Court discussed above supporting personal jurisdiction over the movant. Plaintiffs have alleged that "[t]his Court has personal jurisdiction over Defendants because they have purposefully shipped and sold their infringing products through established distribution and retail channels into the Eastern District of Texas. . . ." Complaint ¶3. As this Court held in *Nidec Corp. v LG Innotek Co., Ltd.*, No. 6:07cv108 (E.D. Tex. December 11, 2008) (M.J. Love), "allegations that a defendant purposefully shipped the accused product into the forum state through an established distribution channel are generally sufficient to establish specific personal jurisdiction." *Id.* at 6 (citing

*Beverly Hills Fan Co.*, 21 F.3d at 1565).  Li & Fung has not rebutted this allegation.

Moreover, Plaintiffs have submitted evidence making more than a *prima facie* showing that Li & Fung, acting in consort with its wholly-owned subsidiaries Toy Island manufacturing and Toy Island USA, arranged to have the accused products manufactured and then imported into the United States for sale by Toy Island USA to well-known national retailers.  Li & Fung, through its control of these subsidiaries as part of the Li & Fung Group, placed the accused products in the stream of commerce, knowing the likely destination of the products would include Texas.  Li & Fung's own web site proclaims **it** export business as having a "global reach" and that Li & Fung has a "global presence covering "over 80 offices in more than 40 economies around the world," and that "the US market remains important to the Group," and that "[g]rowth has also been derived from the US onshore business."

There is no doubt that Li & Fung and the Toy Island members of its Group understood that some of the accused products they sold to national retailers in the United States would be sold in Texas.  *See GSK Tech., Inc., v. Schneider Elec., S.A.*, 6:06-cv-361, 2007 WL 788343 at *2 (E.D. Tex. March 14, 2007) (Davis, J.) (finding that evidence of sale of defendant's products into a nationwide distribution network along with evidence that the products were available in Texas amounted to a prima facie showing of purposeful entry into the Texas stream of commerce). "Within the United States, the State of Texas has the second largest population of any state and three of the ten most populated cities." *Id.*  Thus, Plaintiffs' evidence that Toy Island USA, as opart of the Li & Fung Group global supply chain network, continuously has sold its products to United States nationwide retailers is a strong indication that it intends to direct its

products nationwide. *See also ATEN Int'l Co. v. Emine Tech. Co.*, No. 2:08-cv-253, 2009 WL 1809978, at *6 (E.D. Tex. June 25, 2009).

Li & Fung, as a result of its creation and operation of its global export and distribution network and purposeful activity directed to the entire United States market, including Texas, should reasonably have anticipated being brought into court here.

> **5.    The Reasonableness of Exercising Personal Jurisdiction Over Li & Fung**

Although the Court has found Defendant's contacts sufficient to establish personal jurisdiction, the Court must not exercise jurisdiction if it would offend the traditional notions of fair play and substantial justice. Determining if an exercise of jurisdiction would offend these principles involves balancing "(1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the interest of the states in furthering their social policies." *Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 429 (Fed. Cir. 1996).

"Cases where personal jurisdiction offends traditional notions of fair play and substantial justice 'are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum.'" *ATEN Int'l*, 2009 WL 1809978 at *4 (quoting *Beverly Hills Fan*, 21 F.3d at 1568).

Li & Fung has not shown that this is one of the rare cases where exercising

personal jurisdiction would offend traditional notions of fair play and substantial justice. Li & Fung has not made any arguments or submitted any evidence showing forcing it to defend this case in Texas would be unreasonable.   As discussed above, Li & Fung executives routinely travel to the United States to oversee its substantial business interests here.   Modern communication and transportation mitigate any potential inconvenience.  *See World-Wide Volkswagen*, 444 U.S. at 294; *see also Icon Health & Fitness, Inc. v. Horizon Fitness, Inc.*, No. 5:08-cv-026, 2009 WL 1025467, at *15 (E.D. Tex. Mar. 26, 2009); *Jacobs Chuck Mfg.*, 2005 WL 3299718 at *8-9.  Furthermore, Texas has a significant interest in discouraging injuries, such as patent infringement, within its borders.   *See Beverly Hills Fan*, 21 F.3d at 1568.   Therefore, exercising personal jurisdiction over Li & Fung does not offend traditional notions of fair play and substantial justice.

Dated: February 12, 2010

<div style="margin-left:40%">

Respectfully submitted,

**BUEHER, JOE & CARPENTER, LLC**

By:      /s/ Eric W. Buether _____
         Eric W. Buether
         Attorney in Charge
         Texas State Bar No. 03316880
         E-mail:  buethere@gtlaw.com
         1700 Pacific Avenue, Suite 2390
         Dallas, Texas 75201
         Phone: (214) 466-1270
         Fax: (214) 635-1827

</div>

**PERETZ CHESAL &
HERRMANN, PL**

Steven I. Peretz
Florida Bar No. 329037
E-mail: speretz@kpkb.com
17th Floor Miami Center
201 S. Biscayne Boulevard
Miami, Florida 33131
Phone: (305) 379-9000
Fax: (305) 379-3428

**POTTER MINTON, PC**

Michael E. Jones, Esq.
State Bar No. 10929400
500 Plaza Tower
Tyler, Texas 75702
Phone: (903) 597-8311
Fax:     (903) 593-0846

***ATTORNEYS FOR PLAINTIFFS,
GOOD SPORTSMAN
MARKETING, LLC, AND IP
HOLDINGS, INC.***

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served via the CM/ECF filing system with the Clerk of the Court for the U.S. District Court for the Eastern District of Texas, Tyler Division on February 12, 2010.

By:     s/Eric W. Buether
        Eric W. Buether